## State of Vermont v. Stephen V. Wootten

[756 A.2d 1222]

No. 98-553

Present: Amestoy, C.J., Dooley, Morse, Johnson and Skoglund, JJ.

Opinion Filed April 7, 2000

Motion for Reargument Denied May 10, 2000

*William H. Sorrell*, Attorney General, and *Susan R. Harritt*, Assistant Attorney General, Montpelier, for Plaintiff-Appellant.

*Stephen V. Wootten*, Pro Se, Island Pond, Defendant-Appellee.

**Johnson, J.** In this case, we decide whether Vermont has jurisdiction over the crime of custodial interference where defendant took his children from the state of Vermont while he was the lawful custodian. The State contends that, where the children and defendant were Vermont residents before defendant absconded, the orders of a Vermont court were flouted, and the taking of the children occurred in Vermont, Vermont has jurisdiction to prosecute defendant. We agree, reverse the trial court's dismissal, and reinstate the charges against defendant.

Laurie Marrano and Stephen Wootten married and had two boys, Seth and Nathaniel. They lived with the Community Church in Island Pond, Vermont. In 1987, mother returned to her home in western New York, and the boys stayed in defendant's care in Island Pond. In June 1989, mother filed for divorce in Vermont, not seeking custody of the boys. On September 5, 1989, she amended her complaint to request custody.

On September 5, 1989, the Essex Superior Court held a hearing on the issue of custody. Mother testified that she loved her children and wanted to raise them. She explained that in the two years since she had left Island Pond, her visitation with the boys had been extremely limited and always supervised. She also testified that defendant had warned her he would take the children and "disappear" if she sought custody. The court specifically found that mother had seen the children only six or seven times over two years, visitation had always been supervised, and she had sent letters and presents that she believed defendant had not given to the children. The court also found that defendant had threatened to disappear with the children, but said, "hopefully [that is] no longer a current threat." It concluded that there was no evidence that mother would be a negative influence on the children and that it would be in the best interests of the children to have contact with both parents.

The court therefore ordered that defendant should have temporary physical custody until September 27 at 3:00 p.m. and that mother have unsupervised, separate visitation with the boys on September 6

and September 26, in Vermont. The court further ordered, "neither party shall remove the children, Seth and Nathan, from the State of Vermont pending further order of this court." Both parties had notice that the September 27 hearing would revisit the issue of custody.

On September 26, mother went to Island Pond to pick up the boys for the court-ordered visitation and was told by a church member that defendant had taken the children away. Defendant failed to appear at the custody hearing on September 27. The superior court took evidence and made findings that defendant had failed to obtain needed medical care for the children in the past, and was not fostering a relationship between the children and their mother. The court also noted that defendant had failed to appear at the hearing and that the location of the children was unknown. The court therefore awarded temporary custody to mother, which was made permanent in 1990.[1] The following day, the state of Vermont charged defendant with custodial interference, dating from September 27.

Affidavits from the Wootten children presented to the trial court detail their experience of the seven and a half years between September 1989 and March 1997. Defendant took the children into hiding with him when he fled Vermont in September 1989. Over the years following, defendant moved the family at least eight times. Defendant adopted a false identity and gave the boys false names. The boys, aged six and eight when abducted, were never enrolled in school for the seven years they lived with their father in hiding. Nor were they permitted to participate in any activities that required positive identification. Both affidavits state that defendant told the children they were running and hiding from mother, who was trying to locate them.

In March 1997, defendant was finally located in Florida, and the boys were returned to mother in Oswego, New York. He was arrested and waived extradition to Vermont. On October 21, 1997, he filed a motion to dismiss for lack of a prima facie case, alleging that the State could not show he "knowingly" kept the children from mother. The district court denied the motion, having determined that defendant

---

[1] Defendant did not challenge the custody decision until May 1998, some seven and a half years later. The Essex Family Court dismissed defendant's motion for relief, noting that defendant had notice that he was not to remove the children, had notice of the September 27 hearing that he failed to attend, and never attempted to participate in that hearing or any later aspect of the custody proceedings. The court specifically found that defendant may have removed the children prior to September 27, which would have been a clear violation of the September 5 order.

knowingly kept mother and the authorities from discovering the children's whereabouts. The court specifically noted that, although defendant was "not physically served with the September 28, 1989, Order," that factor was not dispositive because there was substantial evidence that defendant actually knew he was interfering with custodial rights.

On August 31, 1998, defendant filed a motion to dismiss for lack of jurisdiction. The State responded that Vermont had jurisdiction because the children were Vermont residents who were injured by defendant's conduct and because defendant violated a superior court order prohibiting the removal of the children. On December 3, 1998, the court dismissed the State's case for lack of jurisdiction based on our decision in *State v. Doyen*, 165 Vt. 43, 676 A.2d 345 (1996), holding that Vermont had jurisdiction to prosecute custodial interference where the deprived mother was a Vermont resident.

■ The State appeals the dismissal of the charges of custodial interference for lack of jurisdiction. It argues that Vermont may properly exercise jurisdiction for three reasons. One, the children were Vermont residents at the time of their abduction.[2] Two, defendant removed the children from Vermont, thereby committing an act within Vermont's territorial borders. Three, defendant's removal of the children was in direct violation of a Vermont court order prohibiting either parent from removing the children from the state.[3]

---

[2] Because we find the first reason is sufficient to support jurisdiction in this case, we need not reach the other grounds suggested by the State.

[3] Defendant filed two motions to strike, requesting that we strike the following: (1) a memorandum submitted to the trial court in opposition to defendant's motion to dismiss for lack of jurisdiction; (2) all portions of the trial court record in this criminal case prior to the withdrawal of then-State's Attorney Jan Paul on March 23, 1998; (3) transcripts of the hearings regarding custody in the 1989 divorce action; and (4) the docket sheets and opinion in the divorce action in the family court. Item (1), defendant argues, was a reply brief that the State was not entitled to file and to which he objected in the trial court. The court never ruled on his objection, however, and the State was permitted to argue its memorandum at the hearing. The memorandum is therefore one of the original papers filed in the district court in this case and properly before this Court. See V.R.A.P. 10(a).

Defendant moved to strike all parts of the record formed prior to the withdrawal of State's Attorney Jan Paul because, he alleges, Ms. Paul had a conflict of interest. Whatever the truth of the alleged conflict, striking the record of the court's actions in this judicial proceeding is not the proper remedy. Cf. *State v. Crepeault*, 167 Vt. 209, 218, 704 A.2d 778, 784 (1997) (requiring disclosure of potential conflict so that court can decide whether attorney is disqualified).

Defendant also moved to strike the transcripts of hearings held by the superior court on the issue of custody on September 5, 1989, and September 27, 1989. The transcripts

Defendant's argument against jurisdiction centers on two themes: (1) that jurisdiction for custodial interference lies only in the state where the lawful custodian resides, in this case, New York; and (2) that Vermont cannot exercise jurisdiction where a defendant was never served with the order depriving defendant of custody. First, we determine whether Vermont courts possess jurisdiction in this case. Second, we consider defendant's argument that his willful evasion of notice deprives the state of jurisdiction.

## I.

■ The statute at issue defines custodial interference as "taking, enticing or keeping a child from the child's lawful custodian, knowingly, without a legal right to do so, when the person is a relative of the child and the child is less than eighteen years old." 13 V.S.A. § 2451(a).[4] It is undisputed that defendant is a relative of the boys and that they were less than eighteen years old when he removed them from Vermont. Thus, the issues in this case are whether defendant's actions in "taking, enticing or keeping" the children permit Vermont jurisdiction, and whether he acted "knowingly, without a legal right to do so."

Criminal jurisdiction has traditionally rested on one of two grounds. The common law rule is that "a state has power to make conduct *or the result* of conduct a crime if the conduct takes place *or*

---

were presented to the trial court judge at the hearing on December 3, 1998. Therefore, these transcripts have already been introduced in the criminal proceedings underlying this appeal. Although the trial court failed to take formal notice of the transcripts, the documents themselves were before it and the parties both referred to the content of the transcripts. Defendant made no objection at that hearing to the court's review of the transcripts and has since relied on those transcripts to support some of his own arguments. In these circumstances, defendant has waived any objection by failing to raise it below and by relying on these materials in his filings in this Court.

Finally, defendant objects to the State's inclusion of the family court docket sheets and an opinion by Judge Cohn in its submissions to this Court. As these documents formed no part of our consideration, defendant's motion to strike these items is denied as moot.

Both motions to strike are denied.

[4] Another statutory provision, making specific reference to § 2451, clarifies that "the parent with physical responsibility shall be considered the custodial parent." 15 V.S.A. § 665(e). It would seem, therefore, that the Legislature intended the statutory scheme to mean only one parent would be "the lawful custodian." This interpretation of the statutes is, however, in derogation of the state's avowed policy of encouraging joint custody, and therefore we decline to rely on an interpretation of these two statutes that permits the existence of only one custodian at any moment. See also *State v. Petruccelli*, 170 Vt. 51, 59, 743 A.2d 1062, 1068 (1999) (recognizing that parents of a child may both have a right to physical custody of the child).

*the result* happens within its territorial limits." 1 W. LaFave & A. Scott, Substantive Criminal Law § 2.9(a), at 180 (1986) (emphasis added). See also *Doyen*, 165 Vt. at 49, 676 A.2d at 348 (collecting cases in context of custodial interference). This doctrine has been known as the "effects" doctrine, because it holds that a state may exercise jurisdiction when the effects of a crime are felt within the state. See, e.g., Restatement (Second) of Conflict of Laws § 37 (1971) ("A state has power to exercise judicial jurisdiction over an individual who causes effects in the state by an act done elsewhere with respect to any cause of action arising from these effects . . . .").

As we commented in *Doyen*, the United States Supreme Court has "endorsed this view of a state's criminal jurisdiction." See *Doyen*, 165 Vt. at 49, 676 A.2d at 348 (citing *Strassheim v. Daily*, 221 U.S. 280, 285-86 (1911)). The *Strassheim* Court held that "[a]cts done outside a jurisdiction, but intended to produce and producing detrimental effects within it, justify a state in punishing the cause of the harm as if [defendant] had been present at the effect, if the state should succeed in getting him within its power." *Strassheim*, 221 U.S. at 285. Thus, when we first addressed a case of custodial interference, we considered our jurisdiction in light of the effects doctrine.

Most courts considering custodial interference have viewed it as a crime of omission occurring in the state where the deprived custodian resides and therefore based their jurisdiction on the "effects" doctrine. See, e.g., *Wheat v. State*, 734 P.2d 1007, 1010 (Alaska Ct. App. 1987) ("[T]he commission of a crime is consummated in Alaska when the crime is defined to require a result as a necessary element and when that result occurs inside the state."); *State v. Doyle*, 828 P.2d 1316, 1318-19 (Idaho 1992) (construing Idaho statute and finding jurisdiction); *People v. Harvey*, 435 N.W.2d 456, 457 (Mich. Ct. App. 1989) ("The detrimental effects of defendant's intentional retention of the [child] in violation of the Michigan court's custody order occurred [within the state], since it was the authority of a Michigan court that was thwarted and it was the custodial right of a Michigan resident that was infringed upon."). These states have reasoned that the effects of a deprivation are felt where the injured party lives.

We turned to this line of cases when we first construed our own custodial interference statute. In *Doyen*, a father who had visitation rights picked up his daughter in Vermont and left the state. The visitation period ended two weeks later, but the father did not return the child to her mother. The father and daughter were eventually located in Hawaii, and he was charged with custodial interference by

Vermont. He contended that the "keeping" of the child occurred exclusively outside of Vermont, thereby precluding Vermont jurisdiction. See *Doyen*, 165 Vt. at 45, 676 A.2d at 346. We held that, where the deprived mother was a Vermont resident, Vermont could exercise jurisdiction over the father even for out-of-state conduct. See *id.* at 50, 676 A.2d at 348. As we observed there, the custodial interference statute "explicitly contemplates application to a person who has kept a child outside of Vermont." *Id.* at 46, 676 A.2d at 346 (interpreting statutory language of "keeping"). We noted that other states dealing with custodial interference crimes have found two bases for jurisdiction: first, that the crime is one of omission occurring in the lawful custodian's state of residence, and second, that states may impose criminal sanctions for out-of-state conduct that has detrimental effects within the state. See *id.* at 47, 676 A.2d at 347.

Although the State in *Doyen* argued that jurisdiction was appropriate because the child *and* the lawful custodian were Vermont residents, see *id.* at 45, 676 A.2d at 345, our opinion considered first the issue of the deprived mother's residence and found that, because she was a Vermont resident, Vermont could exercise jurisdiction. This holding comported with the line of cases cited above finding jurisdiction in the state where the deprived custodian resides. *Doyen* did not, therefore, require us to reach the question of whether a child's residence would justify jurisdiction. The instant case requires us to answer that question.

Defendant reads *Doyen* to say that the deprived custodian's state has *exclusive* jurisdiction over the crime of custodial interference. We do not agree with this reading. It is certainly true that most states have concluded that the state where the wrongfully deprived custodian lives may prosecute for custodial interference. See *id.* at 46-47, 676 A.2d at 346-47 (collecting cases). It does not follow, however, that the custodial parent's state is the *only* state that may ever exercise jurisdiction over the crime of custodial interference.

The elements of the offense of custodial interference include (1) an intentional (2) taking, enticing away, keeping, or withholding which (3) unlawfully deprives the custodian of custody. See *id.* at 50, 676 A.2d at 348 (citing *Doyle*, 828 P.2d at 1320). It is an unnecessarily narrow construction of the statute to view the crime of custodial interference as having only one victim. Parental abductions not only deprive the other parent of the child, but also deprive the child of contact with the other parent, and, in cases like this one, deprive the child of an ordinary childhood. Failing to recognize the harm done to children by

these abductions is, in some way, to excuse the abducting parent. Therefore, in examining the effects of defendant's actions, we consider the effects on the children wrongfully retained.

In this case, Nathan and Seth Wootten were Vermont residents at the time that they were abducted by their father. They had been living in Vermont for at least three years. In considering defendant's motion to dismiss, the trial court considered that for seven and a half years, the children had been unable to enroll in school or participate in any activity that required positive identification. Defendant told them to lie to people about where they were going and forced them to use false names. Over the years that they were in hiding, defendant moved the family at least eight times. The Vermont superior court had determined, at the September 27, 1989, hearing, that it was in the best interests of the boys to live with their mother. Due to defendant's actions, they had no contact with their mother from September 1989 to March 1997.

It is impossible to avoid the conclusion that the two boys who were spirited out of Vermont and lived on the run for seven and a half years were also victims of defendant's custodial interference. They were deprived of a normal childhood as well as any chance to know their mother, and denied an education. Several states have recognized that both children and parents are victims of custodial interference. An Alaska commission working on revising the criminal code "specified that the victim of the crime is *not only the child* but also the custodian who has been deprived of the child's custody." See *Strother v. State*, 891 P.2d 214, 220 (Alaska Ct. App. 1995) (emphasis added). An Oregon appeals court noted, "[c]learly, the primary focus of the statute is the protection of the rights and interests of the two victims of the offense: the child and the lawful custodian from whom the child is taken, enticed or kept." *State v. West*, 688 P.2d 406, 408 (Or. Ct. App. 1984) (internal quotation marks omitted).

Another state has recognized that the child's residence forms part of the basis for jurisdiction in cases involving children. In *In re Vasquez*, 705 N.E.2d 606 (Mass. 1999), the Supreme Judicial Court of Massachusetts considered a defendant arrested in Massachusetts for criminal nonsupport of his children, who lived in Oregon with their mother. Discussing the effects doctrine, the court observed that in nonsupport and custodial interference cases, the defendant's actions caused "detrimental effect[s] occurr[ing] where the child reside[s] with his or her guardian." *Id.* at 611. The court evidently did not consider the situation presented by this case, where the children have

a different home state than their custodial mother, due to the very change in custody that defendant seeks to defeat by absconding. Nonetheless, the court's recognition that the child's residence may be the situs of the crime of nonsupport comports with our conclusion that the child's residence may be a secondary situs of the crime of custodial interference.

In considering whether Vermont may exercise jurisdiction, we are mindful that, under both the Uniform Child Custody Jurisdiction Act and the Parental Kidnapping Prevention Act, Vermont was the "home state" of the Wootten children. See 15 V.S.A. § 1031(5); 28 U.S.C.A. § 1738A(b)(4) (home state means state in which child lived with his parent(s) for six consecutive months immediately preceding the litigation). Therefore, Vermont was the *only* state which could properly have exercised jurisdiction over the custody of these two boys at the time that mother filed for divorce and requested custody of the boys. As we noted in *State v. Petruccelli*, 170 Vt. 51, 59, 743 A.2d 1062, 1068 (1999), custodial interference statutes "were intended to respond to the increasing occurrence of parental abduction of children as a means to settle a custody dispute or to permanently alter custody." Obviously, this crime most frequently arises in the context of an on-going custody dispute and, as a practical matter, the state deciding custody will have the greatest interest in enforcing its orders and ensuring compliance.[5] Because Vermont was the home state of the children and was the state adjudicating the custody, Vermont had the greatest interest in compliance with its custody orders. In addition, the state adjudicating custody will already have familiarity with the case and the family when a parent commits custodial interference. In the rare situation, as here, that a deprived custodian does not live in the state adjudicating custody, that state may have a greater justification for exercising jurisdiction than the custodian's home state.

This reasoning is supported by the text of both the UCCJA and the PKPA, which gives weight to factors such as significant connections between the family and one state, see 15 V.S.A. § 1032(a)(2)(A), and where significant information about the family may be found. See 15 V.S.A. § 1032(a)(2)(B). In this case, both of these factors support Vermont's jurisdiction. Defendant and the two children were all

---

[5] In practice, this case demonstrates Vermont's greater interest in the matter. When mother took the September 27 order to New York to register the custody order, New York refused to register it based on the lack of service on defendant. Thus, defendant's strategy of disappearing succeeded in making his prosecution by New York unlikely.

Vermont residents. Vermont was the only proper home state to adjudicate the custody issues, and in fact had been adjudicating them, thereby creating a record that is integrally connected to the criminal prosecution in this case. These facts demonstrate a significant connection between this family and the state of Vermont. In addition to the trial court records, the people with knowledge of defendant's actions relevant to his alleged crime, such as the members of his church, are located in Vermont.

In the instant case, defendant's actions injured the children first and foremost. Those children were Vermont residents, and a Vermont court was adjudicating their custody. Vermont therefore may exercise jurisdiction to prosecute defendant for kidnapping his children. This result advances the purposes of the statutes intended to limit and penalize parental abductions — it facilitates the prosecution of defendants in the states where information about their actions exists and where the detrimental effects were felt, either by the deprived custodian or, in certain cases, by the children abducted.

Defendant's argument against jurisdiction relies very heavily on our holding in *Doyen*. But, as explained above, *Doyen* presented different facts, and this case presents us with a strong justification for Vermont's jurisdiction. The *Doyen* rule is appropriate and necessary as a general rule. It is true that the state where the lawful custodian resides experiences the effects of that custodian's deprivation of his or her children. *Doyen* did not, however, hold that the deprived custodian's state has *exclusive* jurisdiction over custodial interference. Nor have the other courts addressing custodial interference charges. These courts have merely held that the custodian's residence in the state can confer jurisdiction. See, e.g., *Strother*, 891 P.2d at 220; *State v. Aussie*, 854 P.2d 158, 160 (Ariz. Ct. App. 1993); *State v. Evans*, 442 S.E.2d 287, 289 (Ga. Ct. App. 1994); *Doyle*, 828 P.2d at 1321; *People v. McLaughlin*, 606 N.E.2d 1357, 1358-59 (N.Y. 1992). Thus, defendant's reliance on these cases, finding jurisdiction in the deprived custodian's home state, is inapposite once we have decided that the children are victims also and their residence in Vermont justifies jurisdiction.

■ Where, as here, the children taken from their mother were residents of Vermont, and where the Vermont court was in the midst of properly exercising jurisdiction over a custody determination under the UCCJA and the PKPA "home state" test, and where the information about the situation and the parties is primarily located in

Vermont, Vermont's jurisdiction over the custodial interference charges is proper.

## II

Defendant nonetheless contends that because he fled the state and disappeared under a false identity for over seven years, preventing service of the September 27, 1989, custody order on him, Vermont cannot exercise jurisdiction over his crime. We reject this argument. The claim depends on two assertions, neither of which is true. First, defendant asserts that he cannot be prosecuted for custodial interference because he was the children's lawful custodian at the moment of the taking. We have recently rejected this very argument in *Petruccelli*, 170 Vt. at 60-61, 743 A.2d at 1069. Second, defendant argues that, because he did not receive notice of the order changing custody, he was not "knowingly" retaining the boys. The weight of authority is to the contrary.[6]

Even assuming defendant's arguments were meritorious, they are not jurisdictional in nature. They are more properly framed as arguments that the State cannot make out a prima facie case against defendant. In fact, defendant made these same arguments in his motions to dismiss in June and October 1997. The trial court denied the motions and observed that, although defendant was "not physically served with the September 28, 1989, Order," that factor was not dispositive because there was substantial evidence that defendant actually knew he was interfering with custodial rights. Having failed to appeal the order denying his motions, defendant cannot raise those issues in this Court, claiming that they are bars to jurisdiction. The factual question of defendant's "knowledge" may be litigated at trial on the merits.

---

[6] We note numerous decisions of other states holding that actual or constructive notice of a custody order is sufficient to satisfy the "knowledge" requirements of a custodial interference statute. See *Strother*, 891 P.2d at 224 (inferring defendant's knowledge of his unlawful behavior from facts that he removed child to another state, left a letter for wife saying she would never see daughter again, and kept whereabouts hidden from authorities for several weeks); *People v. Lortz*, 187 Cal. Rptr. 89, 93 (Ct. App. 1982); *Sampson v. Sampson*, 975 P.2d 1211, 1217 (Kan. 1999); *State v. Arceneaux*, 695 So. 2d 1148, 1150 (La. Ct. App. 1997); *People v. McBride*, 516 N.W.2d 148, 150 (Mich. Ct. App. 1994); *State v. Fitouri*, 893 P.2d 556, 559 (Or. Ct. App. 1995); *Lozano v. Lozano*, 983 S.W.2d 787, 789 (Tex. Ct. App. 1998); *State v. Ohrt*, 862 P.2d 140, 142 (Wash. Ct. App. 1993). As the Michigan Court of Appeals commented, "[t]he policy underlying the parental kidnapping statute would be ill served if one parent could evade service of process, remove children from the custodial parent, then successfully claim immunity from prosecution." *McBride*, 516 N.W.2d at 151.

*Reversed. The charges against defendant are reinstated and the matter remanded for further proceedings not inconsistent with this opinion.*